| | | |
|---|---|---|
| **JAMES BOYLE, SR., on behalf of** | : | **CIVIL ACTION** |
| **himself and others similarly situated** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PROGRESSIVE SPECIALTY** | : | |
| **INSURANCE COMPANY** | : | **NO. 09-5515** |

## MEMORANDUM OPINION

**Savage, J.**                                                                                    **June 7, 2018**

Plaintiff, James Boyle, Sr.,[1] moves to certify this putative class action filed on behalf of all Pennsylvania policyholders of the defendant automobile insurer Progressive Specialty Insurance Company whose cars were equipped with passive antitheft devices and did not receive the statutorily mandated ten percent discount on their premium for comprehensive coverage for the period from 2005 to 2018. He alleges that Progressive violated the passive antitheft device discount provision of Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Cons. Stat. Ann. § 1799.1. He also contends that Progressive breached the implied terms of its insurance contracts when it failed to give the antitheft device discount as promised in its rate filings with the Pennsylvania Insurance Commissioner.

Opposing certification, Progressive argues that the plaintiff cannot satisfy the commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23. It also contends that the plaintiff has not met the ascertainability standard because he "cannot identify any reliable sources from which to

---

[1] On March 29, 2012, we granted judgment in favor of Progressive as to plaintiff Pamela Lowe-Fenick's statutory and contractual claims, leaving James Boyle, Sr. as the sole named plaintiff in this action against Progressive. *See* Doc. No. 97.

determine, class-wide, which vehicles are equipped with qualifying antitheft devices," improperly shifting "the burden to [Progressive] to identify all insureds whose vehicles are equipped with qualifying antitheft devices."[2]

Contrary to Progressive's contentions, the requirements of Rule 23(a) are satisfied, and a class action is superior to other methods for the fair and efficient adjudication of the issues. Also, class members can be reliably and easily identified using objective criteria. Therefore, because this action qualifies for class certification under Rule 23(b)(3), the motion will be granted.

## Procedural Background

This action was one of twelve putative class actions filed at the same time against automobile insurers based on the same statutory and state law claims.[3] After the cases were consolidated, two actions were voluntarily dismissed. In the remaining cases, the plaintiffs and the defendants each filed cross-motions for summary judgment, and the plaintiffs moved to certify a class in each action.

Although a ruling on the motions for class certification would typically precede disposition of the motions for summary judgment, the parties requested a decision on the summary judgment motions before considering the class certification motions. *See Willisch v. Nationwide Ins. Co. of Am.*, 852 F. Supp. 2d 582, 587 (E.D. Pa. 2012). After

---

[2]Defs.' Jt. Memo. in Opp'n to Mot. for Class Certification (Doc. No. 104) at 12, 11, 6.

[3]*See Willisch v. Nationwide Ins. Co. of Am.*, Civ. A. No. 09-5276; *Kolesar v. Encompass Indemn. Co.*, Civ. A. No. 09-5510; *Mecadon v. Allstate Indemn. Co.*, Civ. A. No. 09-5511; *Bucari v. Allstate Prop. & Cas. Co.*, Civ. A. No. 09-5512; *Besecker v. Peerless Indemn. Ins. Co.*, Civ. A. No. 09-5513; *Baldoni v. State Farm Mut. Auto. Ins. Co.*, Civ. A. No. 09-5514; *Lowe-Fenick v. Progressive Specialty Ins. Co.*, Civ. A. No. 09-5515; *Fassett v. Nationwide Gen. Ins. Co.*, Civ. A. No. 09-5741; *Warrick v. Allstate Ins. Co.*, Civ. A. No. 09-6077; *Margavage v. Nationwide Mut. Ins. Co.*, Civ. A. No. 10-4820; *Waterman v. USAA Cas.*, Civ. A. No. 10-5016; and *Justice v. Nationwide Affinity Ins. Co. of Am.*, Civ. A. No. 10-5469.

the summary judgment decision, the plaintiffs submitted amended class certification motions.[4] While these motions were pending, an additional action was filed against another Nationwide insurer.[5]  The parties then engaged in extensive settlement negotiations and mediation. Ten insurers reached pre-certification settlement agreements, which were approved in nine of those cases.  The remaining case was dismissed under Local R. Civ. P. 41.1(b).  Progressive is the only insurer that did not settle.

Before embarking on an analysis of the class certification issues, it is necessary to discuss the summary judgment ruling.  It is central to the dispositive factual and legal issues that bear on the Rule 23(a) and (b)(3) requirements.

The Pennsylvania antitheft device discount provision reads:

**§ 1799.1.  Antitheft devices**

**(a) General rule.--** All insurance companies authorized to write private passenger automobile insurance within this Commonwealth shall provide premium discounts for motor vehicles with passive antitheft devices. These discounts shall apply to the comprehensive coverage and shall be approved by the commissioner as part of the insurer's rate filing, provided that such discounts shall not be less than 10%. Some or all of the premium discounts required by this subsection may be omitted upon demonstration to the commissioner in an insurer's rate filing that the discounts are duplicative of other discounts provided by the insurer.

**(b) Definitions.--** As used in this subsection, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

---

[4] *See* Doc. No. 101.

[5] *See Tomaine v. Nationwide Mut. Ins. Co.*, Civ. A. No. 13-5408.

> **"Passive antitheft device."** Any item or system installed in an automobile which is activated automatically when the operator turns the ignition key to the off position and which is designed to prevent unauthorized use, as prescribed by regulations of the commissioner. The term does not include an ignition interlock provided as a standard antitheft device by the original automobile manufacturer.

75 Pa. Cons. Stat. Ann. § 1799.1.

On summary judgment, the parties interpreted the statute differently. The plaintiffs contended that their vehicles were equipped with "passive antitheft devices" as defined in the statute, and the insurers did not give them the discount. The insurers argued that they were not required to give the plaintiffs the discount because their vehicles were not equipped with qualifying devices and they did not request the discount.

Ruling on the cross-motions for summary judgment, we held that automobile insurers must give a ten percent discount on the premium for comprehensive coverage to all insureds whose vehicles are equipped with qualifying antitheft devices – whether or not the insured requests it. *Willisch*, 852 F. Supp. 2d at 587, 594. Accordingly, any insurer who fails to apply the antitheft discount to an insured whose insured vehicle is equipped with a passive antitheft device as defined in § 1799.1(b) violates the statute. We also concluded that the failure to give the discount to those insureds whose vehicles contain passive antitheft devices as defined in the insurers' rate filings constitutes a breach of the implied terms of the insurance contracts. *Id.* at 609–10.

In each of the ten related putative class actions, we determined that thirteen of

the plaintiffs' sixteen vehicles were equipped with passive antitheft devices[6] as defined in the antitheft device discount statute, qualifying them for the discount. In conducting the analysis, we considered evidence,[7] including the insurers' two experts' reports,[8] showing how and when the engine immobilizer devices installed as original equipment in the sixteen vehicles were armed or activated.[9]

The 1997 Cadillac Eldorado, 2002 Buick Rendezvous, 2000 Chevy Blazer, 2004 Chrysler Pacifica, 2005 Jeep Liberty Renegade, 2003 Dodge Neon, 2001 Ford

---

[6]The sixteen vehicles were:

      1997 Cadillac Eldorado - General Motors - Pass-Key II
      2002 Buick Rendezvous - General Motors - Pass-Key III
      2000 Chevy Blazer - General Motors - PassLock
      2004 Chrysler Pacifica - Chrysler - Sentry Key Immobilizer System
      2005 Jeep Liberty Renegade - Chrysler - Sentry Key Immobilizer System
      2003 Dodge Neon - Chrysler - Sentry Key Immobilizer System
      1999 Jeep Grand Cherokee Ltd. - Chrysler - Sentry Key Immobilizer System
      2001 Ford Taurus LX - Ford SecuriLock
      2004 Ford Explorer - Ford SecuriLock
      2008 Ford Expedition - Ford SecuriLock
      2000 Lincoln Town Car - Ford SecuriLock
      2006 Mercedes CLK 350 - Mercedes FBS III
      2007 Mercedes GL 450 - Mercedes FBS III
      2007 Nissan Murano - Nissan Vehicle Immobilizer System
      2008 Honda Accord - Honda Immobilizer System
      2006 Hyundai Sonata - Hyundai Alarm System

[7]For each of these vehicles, the plaintiffs submitted relevant pages from the owner's manual, and for all but the Honda Accord and Hyundai Sonata, National Highway Traffic Safety Administration ("NHTSA") filings. Except for the 2000 Chevy Blazer, the sole evidence we relied on was owner's manuals. For the Chevy Blazer, we also considered a NHTSA notice that described, in greater deal than the owner's manual, how the PassLock device activated. *See Willisch*, 852 F. Supp. 2d at 604 & n.73.

[8]The insurers presented the reports of their two experts, Robert Mangine and Thomas Livernois.

[9]Based on the evidence submitted regarding these sixteen vehicles, we found that the Pass-Key II, Pass-Key III, SecuriLock, Sentry Key, Mercedes FBS III, Nissan Vehicle Immobilizer, and PassLock engine immobilizer systems were designed to prevent unauthorized use and were activated by turning the key to the "off" position. *Willisch*, 852 F. Supp. 2d at 599–606. Because none of the sixteen vehicles contained a Pass-Key I or Pass-Key III+ device and we did not have owner's manuals describing those two types of devices, we consulted NHTSA filings to determine how they activated. The NHTSA notices confirmed that the Pass-Key I and the Pass-Key III+ immobilizers activated in the same way as the other Pass-Key devices. *Id.* at 600, 602. We determined that the Pass-Key I, Pass-Key II, Pass-Key III, Pass-Key III+, SecuriLock, Sentry Key, Mercedes FBS III, Nissan Vehicle Immobilizer, and PassLock engine immobilizer systems fit the statutory definition of a qualifying passive antitheft device. *Id.* at 605.

Taurus LX, 2004 Ford Explorer, 2008 Ford Expedition, 2008 Ford Expedition, 2000 Lincoln Town Car, 2006 Mercedes CLK 350, 2007 Mercedes GL 450 and 2007 Nissan Murano each were equipped with one of those types of qualifying devices as standard equipment. Accordingly, we held that the named plaintiffs who insured those vehicles were entitled to the discount. *Willisch*, 852 F. Supp. 2d at 605–06.[10] In short, once we found that one manufacturer's device in a vehicle qualified, we concluded that all vehicles equipped with that same type device qualified.

We determined that one system did not qualify, and we were unable to determine whether another did. Specifically, we found that the alarm system on the 2006 Hyundai Sonata did not qualify as "passive" because the vehicle's doors had to be locked to activate the alarm. *Id.* at 607. We also found there was insufficient evidence to determine if the Honda Immobilizer System in the 2008 Accord qualified as "passive" because the owner's manual did not describe how it activates. *Id.* at 606.

With respect to the plaintiff's motion for class certification and the identification of class members, Progressive has a database identifying each vehicle, by make, model and year, that it insured for comprehensive loss during the class period and which did not receive the discount.[11] Thus, identifying Progressive's insureds who had comprehensive coverage and did not receive a passive antitheft device discount is easily done.

_____

[10] Because we found that there was a question of fact as to whether a Sentry Key immobilizer system was installed as original standard equipment in the 1999 Jeep Grand Cherokee Ltd., one of Boyle's cars, we made no determination as to whether that make and model year vehicle qualified for the discount. *Willisch*, 852 F. Supp. 2d at 606.

[11] In discovery, Progressive produced an Excel file that identifies the make, model and year of over 192,000 vehicles insured for comprehensive coverage from 2005 through May 26, 2010 that did not receive the discount. *See* Goldstein Decl. (Doc. No. 112-2) ¶¶ 3-6.

It is not so easy, however, to identify which class members' vehicles contain a qualifying engine immobilizer as standard, as opposed to optional, equipment. Nevertheless, it can be done. At the time of oral argument on the motion for class certification, the plaintiff's trial plan did not articulate a method for determining whether a particular vehicle came equipped with a qualifying antitheft device. The plaintiff has supplemented the record to address this deficiency by amending the proposed class definition and creating a chart, which we shall refer to as the Chart of Qualifying Vehicles, listing vehicles containing qualifying devices as standard equipment.[12]

The plaintiff's proposed amended class definition limits qualifying vehicles to those equipped with one of the five types of passive antitheft devices that we identified in our summary judgment opinion as qualifying for the discount under the statute.[13] It provides as follows:

> All policyholders of Progressive who, within the six years before the commencement of this case [November 19, 2009] through the date of the class certification order, had automobile insurance that included comprehensive insurance coverage on a vehicle registered in Pennsylvania, but did not receive at least a 10 percent antitheft discount on the premiums for that comprehensive insurance coverage, and: (a) who insured a make, model and year vehicle that has as standard equipment a Pass-Key or PassLock system, SecuriLock/PATS system, Sentry Key Immobilizer System, Nissan Vehicle Immobilizer System, or Mercedes Immobilizer system, as identified on the list of qualifying vehicles attached to the Goldstein Declaration; and (b) antitheft data available to Progressive from Polk, as supplemented by HLDI antitheft data if Polk codes the

---

[12] *See* Doc. Nos. 112 and 117. The Chart of Qualifying Vehicles (Doc. No. 112-3) is referenced in plaintiff's proposed amended class definition, and is attached to the Goldstein Declaration (Doc. No. 112-2).

[13] The five types are: Pass-Key/PassLock, SecuriLock/PATS, Sentry Key, Nissan/Infiniti Vehicle Immobilizer System and Mercedes Immobilizer System.

vehicle's antitheft device as "Unknown" or as having an unspecified "Antitheft Device," identifies the vehicle as having an engine immobilizer as standard equipment; and (c) Progressive's records show that it has given an antitheft discount in Pennsylvania to the same make, model, and year of vehicle.[14]

To compile the Chart of Qualifying Vehicles, the plaintiff used owner's manuals, manufacturers' spreadsheets, manufacturers' specifications, product brochures and NHTSA notices.[15] To verify the information on the Chart of Qualifying Vehicles and to perform the "rigorous analysis" required, we ordered the plaintiff to amend it by adding citations to the specific sources that support placing each make, model, and year vehicle on it.[16] Progressive filed a response explaining why it contends that certain model year vehicles do not qualify.[17]

Against this backdrop, we shall address the class certification requirements. In ruling on the summary judgment motions, we have decided several common legal and factual issues, informing the analysis.

_____

[14] See Doc. No. 112-1 at 22.

[15] Although the plaintiff also relied on third-party vendor sources to identify qualifying vehicles, for the reasons described *infra* at 25-27, we find that the plaintiff may not use these non-manufacturer sources and will be required to amend the Chart of Qualifying Vehicles consistent with this opinion.

[16] See Doc. Nos. 137, 138-1, 139.

[17] See Doc. No. 148. In brief, Progressive contends that the plaintiff "cherry-picks information from the sources that support his position, and ignores other sources that contain contradictory information," and that the plaintiff's proposed class definition is based on the incorrect premise that the antitheft devices discussed in the summary judgment opinion "activate the same way in every car model in every model year." *Id.* at 2, 3. It objects to the plaintiff's reliance on a number of sources, including owner's manuals that indicate that the antitheft device is optional in that make and model year vehicle; non-manufacturer sources that contain conflicting information about whether a device is standard equipment in the same make and model year vehicle and no description of how the device activates; and NHTSA notices that purportedly describe how devices activate differently than owner's manuals do. We address these specific objections later at 27-58.

## Analysis

For a class action to be certified, the plaintiff must demonstrate that: (1) the size of the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses are typical of the class; and (4) the representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013). Additionally, the proposed class action must be one of the types recognized by Rule 23(b). *City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 438 (3d Cir. 2017). Here, the plaintiff has moved for certification under subsection (b)(3), which requires that common questions of law or fact predominate over questions affecting only individual class members, and that the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 591 (3d Cir. 2012) (citing *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010)). Additionally, a Rule 23(b)(3) class must be "currently and readily ascertainable based on objective criteria." *City Select*, 867 F.3d at 439 (quoting *Marcus*, 687 F.3d at 593).

The Rule 23 requirements are "not mere pleading rules." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008) (citation omitted). Each requirement must be "satisf[ied] through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The plaintiff must do more than make a threshold showing. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) (quoting *Hydrogen Peroxide*, 552 F.3d at 307). In other words, the plaintiff must make his case for certification when he moves for class certification. A promise that he will do so later is

insufficient. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354, 358 (3d Cir. 2013); *Hydrogen Peroxide*, 552 F.3d at 318 (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001)).

Determining whether the plaintiff has established, by a preponderance of the evidence, facts necessary to satisfy the Rule 23(a) and 23(b)(3) prerequisites for class certification demands a "rigorous analysis." *Comcast Corp.*, 569 U.S. at 33; *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (quoting *Hydrogen Peroxide*, 552 F.3d at 309). The analysis looks beyond the pleadings. It entails a critical review of the elements of the cause of action through the "prism of Rule 23." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Newton*, 259 F.3d at 181). Resolving factual and legal disputes necessarily requires some inquiry into the merits. *Carrera*, 727 F.3d at 306 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). Oftentimes, resolving conflicts among experts will be necessary. *Id.* at 323–24; *Hydrogen Peroxide*, 552 F.3d at 323–24.

### *The Four Requirements of Rule 23(a)*

#### *Numerosity*

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." *Hayes*, 725 F.3d at 356 (quoting Fed. R. Civ. P. 23(a)(1)).

Numerosity is not an issue. During the class period, Progressive insured hundreds of thousands of vehicles in Pennsylvania for comprehensive loss that did not receive the antitheft device discount.

*Commonality*

Before the certification motion was filed, dispositive common and typical issues had already been determined. Consequently, commonality and typicality are satisfied. Nevertheless, we shall address them.

The plaintiff must share a question of law or fact with the prospective class members. Commonality means "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original) (citation omitted).

The commonality threshold is low. It "does not require identical claims or facts among class member[s]." *Marcus*, 687 F.3d at 597 (citation omitted). A single common question is sufficient. *Dukes*, 564 U.S. at 359 (citation omitted). So long as the plaintiff shares at least one question of fact or law with the grievances of the prospective class, the existence of individual facts and circumstances will not defeat commonality. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (citation omitted).

In this case, there are several common legal and factual questions. We have decided controlling common legal issues. We answered the question whether § 1799.1 mandates that Progressive give a ten percent discount on the premium for comprehensive coverage to all of its insureds whose vehicles are equipped with qualifying antitheft devices, even if they did not request it. We also answered the question of whether an insurer violates the antitheft device discount statute when it fails to give the discount to an insured whose vehicle is equipped with a passive device as defined in § 1799.1(b).

All class members have these dispositive issues in common.  Each had insured a vehicle equipped with a qualifying device for comprehensive coverage and did not receive the discount.  Therefore, the commonality requirement has been met.

*Typicality*

The typicality prong of Rule 23(a) requires that the claims or the defenses of the plaintiff are typical of the class.  Fed. R. Civ. P. 23(a)(3).  While the "concepts of typicality and commonality are closely related and often tend to merge," typicality differs from commonality in "its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present."  *Marcus*, 687 F.3d at 597–98 (citations omitted).

There are three distinct, but related, parts to the typicality assessment: (1) the class representative and the members of the class must share both the legal theory and the factual circumstances supporting that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the class representative's interests and incentives must be sufficiently aligned with those of the class.  *Marcus*, 687 F.3d at 598 (quoting *Schering Plough*, 589 F.3d at 598–99).

Typicality requires a strong similarity of legal theories to ensure that the class representative's pursuit of his own goals will work to benefit the entire class.  *Barnes v. Am. Tobacco* Co., 161 F.3d 127, 141 (3d Cir. 1998) (citing *Baby Neal v. Casey*, 43 F.3d 48, 57–58 (3d Cir. 1994)).  Typicality is undermined where the plaintiff's claims are subject to unique defenses that may become the focus of the litigation.  *Schering*

*Plough*, 589 F.3d at 598 (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006)). Nevertheless, factual differences will not necessarily defeat typicality. As long as the claim arises from the same practice or course of conduct that affects the class members, or there is a "strong similarity of legal theories," typicality is satisfied. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998)).

Because we "cannot assess whether an individual is sufficiently similar to the class as a whole without knowing something about both the individual and the class," we must consider the attributes of the proposed representative and the class as a whole, and examine the similarity between the proposed representative and the class. *Schering Plough*, 589 F.3d at 597–98.

Boyle, like the class members, claims he insured a vehicle for comprehensive insurance coverage and Progressive did not give him an antitheft device discount even though he qualified for one. Boyle insured two vehicles with Progressive, a 2001 Ford Taurus and a 1999 Jeep Grand Cherokee Limited. As addressed in more detail later,[18] both vehicles came equipped with a qualifying device. Boyle's 2001 Ford Taurus had a SecuriLock passive antitheft system and his 1999 Jeep Grand Cherokee had a "Vehicle Theft Security System with security alarm and Sentry Key Engine Immobilizer" as standard equipment. Thus, Boyle's claim is typical of the putative class.

---

[18] *See infra* at 39-40 & n.58.

*Adequacy of Representation*

Rule 23(a)(4) aims to protect the interests of the class members by ensuring that they are adequately represented. There are two parts to the adequacy test. One assesses the class representative's motivation and ability to protect the interests of the class members. The other goes to the competency of counsel.

Testing the adequacy of the class representative assures that there are no divergent or conflicting interests between the class representative and the class members. *Schering Plough*, 589 F.3d at 602 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004)). Additionally, the court must be confident that the "putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously." *Larson v. AT & T Mobility LLC*, 687 F.3d 109, 132 (3d Cir. 2012) (quoting *Cmty. Bank of N. Va.*, 622 F.3d at 291). This part of the adequacy test tends to merge with the typicality requirements that the interests and incentives of the representative be sufficiently aligned with those of the class and the class representative and not be subject to defenses unique to the class representative. *Schering Plough*, 589 F.3d at 602 (citing *Beck*, 457 F.3d at 296).

There are no conflicts or divergent interests between Boyle and the class members. Nothing will impair his ability to adequately protect the interests of the absent class members. Their interests are the same. Protecting his interest necessarily protects their interests. Therefore, Boyle has satisfied this part of the adequacy requirement.

Turning to the adequacy of counsel, Rule 23(g) governs the analysis. It provides that in appointing class counsel, the court must consider four factors:

(i)     the work counsel has done in identifying or
        investigating potential claims in the action;

(ii)    counsel's experience in handling class actions, other
        complex litigation, and the types of claims asserted in
        the action;

(iii)   counsel's knowledge of the applicable law; and

(iv)    the resources that counsel will commit to representing
        the class.

*Cmty. Bank of N. Va.*, 622 F.3d at 292 (quoting Fed. R. Civ. P. 23(g)(1)(A)).  *See also*

*Sheinberg v. Sorensen*, 606 F.3d 130, 132–33 (3d Cir. 2010).  The court must also

determine if counsel will fairly and adequately represent the interests of the class, Fed.

R. Civ. P. 23(g)(4), and "may consider any other matter pertinent to counsel's ability" in

order to do so.  Fed. R. Civ. P. 23(g)(1)(B).

Counsel is qualified to represent the class.  They are experienced in handling

class actions.  We have observed their expertise and comprehensive knowledge of the

law and the facts in the handling of this case and the related cases through class

certification and settlement.  They have already spent a significant amount of time

working on this case and the related cases.  They have conducted extensive

investigation, drafting of pleadings, discovery, litigation of motions for summary

judgment and motions for class certification, settlement negotiations, and mediations.

They are knowledgeable of the applicable law.  Counsel successfully negotiated

settlement agreements with ten of the insurance companies in the related cases.  They

achieved court approval of pre-certification settlements in nine of those cases.

Therefore, the adequacy of representation requirement is satisfied.

### The Requirements of Rule 23(b)(3) - Predominance and Superiority

In addition to meeting the four requirements of Rule 23(a), the action must also qualify as one of the types of class actions described in Rule 23(b).  In this case, the plaintiff has moved for certification under subsection (b)(3), which requires that common questions of law or fact predominate over questions affecting only individual class members, and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The plaintiff must satisfy both the predominance and the superiority elements of Rule 23(b)(3).

In determining whether the action fits within Rule 23(b)(3), we consider the interest of class members in individually controlling the litigation, the status of ongoing litigation brought by members of the class, the desirability of concentrating the litigation in the particular forum, and likely management difficulties.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  In the end, it is the interests of the individual members in controlling their own litigation that drives the predominance inquiry.  The superiority analysis focuses on the advantages and disadvantages of using the class-action device in relation to other litigation methods.

### Predominance

In a class action brought under Rule 23(b)(3), common questions of law or fact must predominate over questions affecting only individual members and must be a significant part of the individual cases.  The predominance inquiry focuses on whether the elements of the claims of the class can be proven at trial with "common, as opposed to individualized, evidence."  *Taha v. County of Bucks*, 862 F.3d 292, 308 (3d Cir. 2017) (quoting *Hayes*, 725 F.3d at 359).  Class certification is not appropriate if proof of the

essential elements of the cause of action requires individual fact finding or application of different legal principles. *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (citing *Hydrogen Peroxide*, 552 F.3d at 311). The evidence needed to prove each element of the plaintiff's legal claim must be capable of common proof rather than individualized proof. *Marcus*, 687 F.3d at 600. In other words, we must determine whether the claims can be proven with common, class-wide evidence. *Id.*

The predominance standard under Rule 23(b)(3) is "even more demanding" than the requirements under Rule 23(a). *Hayes*, 725 F.3d at 359 (citing *Comcast Corp.*, 569 U.S. at 34). *See also Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). The plaintiff must "demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Marcus*, 687 F.3d at 600 (quoting *Hydrogen Peroxide*, 552 F.3d at 311). In conducting the predominance inquiry, the court must examine each element of a legal claim "through the prism of Rule 23(b)(3)." *Marcus*, 687 F.3d at 600 (citation omitted). Thus, we must predict how specific issues will play out at trial "in order to determine whether common or individual issues predominate in a given case." *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 746 (3d Cir. 2010) (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

The plaintiff is not required to prove his claims for purposes of the predominance inquiry. He need only show that he can establish the elements of his claim at trial by common, not individualized, proof. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011). "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those *questions* will be answered, on the merits, in favor of the

class." *Amgen*, 568 U.S. at 459 (emphases in original). The merits underlying the cause of action need be considered only to the extent that they are "enmeshed" with the certification inquiry. *Comcast Corp.*, 569 U.S. at 34 (citations omitted). Although the plaintiff must submit some evidence that the elements of Rule 23(a) and (b)(3) are met, the plaintiff is not required to prove that the class will succeed.

Boyle's claim is that the class members were entitled to the passive antitheft device discount under 75 Pa. Con. Stat. Ann. § 1799.1 and Progressive did not give it to them. The elements of the claim are: (1) the plaintiff insured a vehicle equipped with a passive antitheft device for comprehensive loss; (2) the device qualified under the statute for a discount; and (3) Progressive did not give him the discount. Each of these elements can be established by common proof. The evidence entitling him to relief is the same evidence applicable to the class members.

Progressive has a database identifying each vehicle, by make, model and year that it insured for comprehensive loss during the class period. The Chart of Qualifying Vehicles identifies, by the make, model and year, the vehicles equipped with a type of passive antitheft device that we identified as qualifying for the discount under the statute. Comparing Progressive's database with the Chart of Qualifying Vehicles, the plaintiff can prove which insureds' vehicles with qualifying devices did not receive the discount.

Progressive argues that determining what passive antitheft devices qualify under the statute and which vehicles have them requires individualized inquiries, rendering the case inappropriate for class-wide adjudication. Mischaracterizing our summary judgment analysis and holding, Progressive erroneously claims that we "employed . . .

18

individualized analysis to deny summary judgment."[19]  It argues that determining whether the device on a given vehicle meets the statutory definition, "necessitates an individual, vehicle-by-vehicle, device-by-device analysis, just as the Court undertook in its summary judgment decision; it cannot be done on a class-wide basis through common proof."[20]  It further contends that "the Court reviewed separately each vehicle insured by each Plaintiff, analyzed separately how each vehicle's antitheft device activates, and determined separately whether each device 'activates when the operator turns the ignition key to the off position.'  Moreover, the Court's individualized analysis produced varying results among the Plaintiffs."[21]

Progressive misapprehends the analysis we conducted to determine whether the plaintiffs' vehicles were equipped with qualifying passive antitheft devices.  We determined what particular devices qualified, not what vehicles qualified.  Then, we determined whether a particular make, model and year of vehicle was equipped with one of those devices, qualifying it for the discount.  Although we looked at each named plaintiff's vehicle in the ten cases, we did so only to determine if each vehicle contained an antitheft device that we had already determined qualified as passive under the statute.  Thus, every insured vehicle having the device, not just the plaintiffs' vehicles, qualify for the discount.

Applying this method on a class wide basis will not be difficult.  Once the plaintiff amends the Chart of Qualifying Vehicles, we can ascertain which make, model and year

---

[19] Defs.' Jt. Memo (Doc. No. 104) at 1.

[20] *Id.* at 4, 14–15.

[21] *Id.* at 14–15.

vehicles contain, as standard equipment, a qualifying device, and every insured with a vehicle of that make, model and year qualifies for the discount. No examination of class members' individual vehicles or the individual antitheft device in each vehicle is required.

Progressive relies upon *Marcus*,[22] a case unlike this one. In *Marcus*, the plaintiffs were unable to prove, through common evidence, the defect that caused each class member's run-flat tire to go flat. There were different reasons why each class member's run-flat tire went flat, sometimes for reasons unrelated to a defect in the tire. 687 F.3d at 604. In order to determine why a particular class member's tire had gone flat and been replaced, each class member's tire had to be individually examined. Consequently, the court held that these individual inquiries were "incompatible with Rule 23(b)(3)'s predominance requirement." *Id.*

Nor is this case like the antitrust price-fixing case in *Hydrogen Peroxide*. There, the district court had failed to consider the degree to which individualized factors influenced pricing and whether every class member suffered the same damages. The Third Circuit held that the plaintiffs had failed to meet their burden to show that they had the ability to assess class-wide antitrust injuries using common, as opposed to individualized, proof. 552 F.3d at 311-314, 325. Here, the measurement of damages is simple. It is ten percent of the comprehensive coverage premium the insured paid in each year during the class period.

---

[22] *See* Progressive's Opp'n to Pl.'s Mot. to Suppl. the Record (Doc. No. 114) at 15.

Class certification is the superior method to adjudicate this case fairly and efficiently. Class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery. *See Amgen*, 568 U.S. at 418; *Amchem Prods., Inc.*, 521 U.S. at 617 (finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"). The amount each class member would receive is less than one hundred dollars. Certainly, no class member would consider bringing an individual action in light of the cost benefit.

Because the plaintiff has satisfied the Rule 23(a) requirements and demonstrated that this action qualifies for class certification under Rule 23(b)(3), we address Progressive's argument that class members cannot be ascertained reliably and efficiently.

### *Ascertainability*

An "essential prerequisite" to class certification is ascertainability, meaning the class members must be reliably and easily identified from objective criteria. *City Select*, 867 F.3d at 439 (citing *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)).

To satisfy the ascertainability standard, the plaintiff must establish that: (1) class members can be identified using objective criteria; and (2) there is a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *City Select*, 867 F.3d at 439 (quoting *Byrd*, 784 F.3d at 163). In short, the plaintiff must show how potential class members can be identified in

an accurate and efficient manner.  *Carrera,* 727 F.3d at 307 (citing *Marcus*, 687 F.3d at 593).

Ascertainability is a separate requirement considered in conjunction with Rule 23(c)(1)(B)'s requirement.[23]  It is not to be conflated with the predominance requirement.  *Byrd*, 784 F.3d at 164 (quoting *Grandalski v. Quest Diagnostics, Inc.*, 767 F.3d 175, 184 (3d Cir. 2014)).  Predominance focuses on whether the essential elements of the class claims can be proven at trial by "common, as opposed to individualized, evidence."  *Byrd*, 784 F.3d at 164 (citing *Grandalski*, 767 F.3d at 184).  Ascertainability, on the other hand, focuses on whether the class members can be identified without resorting to "individualized fact finding."  *Byrd*, 784 F.3d at 163, 164.  In other words, predominance considers the evidence necessary to establish the claims while ascertainability considers the criteria and means necessary to identify class members.

Additionally, at the certification stage, the plaintiff need not identify the actual class members.  He need only show how class members *can* be identified.  *City Select*, 867 F.3d at 439 (quoting *Byrd*, 784 F.3d at 163) (emphasis in *Byrd*).

Here, the plaintiff has satisfied both elements of the ascertainability requirement.  First, he has shown how class members can be identified objectively.  Second, his proposed means of identifying them is both reliable and administratively feasible.

---

[23] Under Rule 23(c)(1)(B), the class certification order must include a "readily discernible, clear and precise statement of the parameters defining the class . . . and list of the [class] claims, issues or defenses. . . ."  *Byrd*, 784 F.3d at 163 (quoting *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006)).

## *Objective Criteria to Identify the Class*

The criteria for class membership are objective.  To be included in the class:

1.  the member must have been a policyholder of Progressive during the class period who insured a vehicle registered in Pennsylvania for comprehensive loss;

2.  the insured vehicle was of a make, model and year that was equipped with, as standard equipment, one of the five types of engine immobilizer systems[24] that qualify as a passive antitheft device under the statute; and

3.  the member did not receive the passive antitheft device discount.

There is nothing subjective about who is included in the class.  Either the putative class member did or did not insure for comprehensive loss a vehicle equipped with a passive antitheft device that qualified for the discount.  If he did, he either received the discount or he did not.  If he did not get the discount, he falls within the class definition.

## *Administrative Feasibility and Reliability*

Even if the task of identifying class members may be difficult and time consuming, it may still be administratively feasible.  In *Byrd*, the Third Circuit made it clear that " 'the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification.'"  784 F.3d at 171 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir. 2012)).  The *Young* court explained that the "need to manually review files is not dispositive.  If it were, defendants against whom claims of wrongful conduct have been made could escape

---

[24] The five types of immobilizer systems are: Pass-Key/PassLock, SecuriLock/PATS, Sentry Key, Nissan/Infiniti Vehicle Immobilizer System and Mercedes Immobilizer System.

class-wide review due solely to the size of their businesses or the manner in which their business records were maintained." *Young*, 693 F.3d at 540 (quoting the district court opinion).

Nor is he required to "demonstrate that a single record, or set of records, conclusively establishes class membership." *City Select*, 867 F.3d at 441 (citing *Byrd*, 784 F.3d at 163). Thus, the submission of affidavits from potential class members, in combination with other records, can meet the administrative feasibility standard. *Id.* at 441 (citing *Byrd*, 784 F.3d at 170–71).

Progressive argues that it is not administratively feasible to ascertain class members without engaging in individualized fact finding. It contends that there are no lists or data compilations from manufacturers or third parties that accurately or reliably identify vehicles with qualifying devices. So, it argues, determining what passive antitheft devices qualify under the statute and which vehicles have them will require a separate review of each class member's vehicle and how each individual antitheft device activates.[25]

Administrative feasibility is not an issue in this case. There is no need for an intensive records search for large numbers of potential class members. In our summary judgment opinion, we identified what types of devices installed in major manufacturers' vehicles qualify under the statute. The plaintiff has compiled the Chart of Qualifying Vehicles that identifies the make, model and year vehicles that are equipped with one of the types of a passive antitheft device that we identified as qualifying. Progressive has a database of policyholders who insured specific vehicles for comprehensive loss and

---

[25] Defs.' Jt. Memo (Doc. No. 104) at 1, 4, 13 and 27.

did not receive the passive antitheft device discount.  Class members can be identified by matching Progressive's database with the Chart of Qualifying Vehicles.  Nothing more needs to be done administratively to ascertain class members.  Class members can be readily identified and ascertained without the need to conduct extensive or individualized fact finding.

The process for identifying class members must also be reliable.  But, reliability does not require absolute accuracy.  *See Young*, 693 F.3d at 539.  Here, identifying and ascertaining class members can be done reliably.  The Chart of Qualifying Vehicles is a reliable source for determining who is in the class.

In devising the Chart of Qualifying Vehicles, the plaintiff relied on both manufacturer and non-manufacturer-based sources.  Manufacturer sources included owner's manuals, vehicle specifications identifying standard vehicle features,[26] and spreadsheets produced by manufacturers.

When lacking a manufacturer source or a NHTSA notice,[27] the plaintiff uses non-manufacturer sources.[28]  For example, if an owner's manual reflects that the antitheft

---

[26] The owner's manuals and the vehicle specifications are found on the manufacturers' websites.

[27] A description and the reliability of NHTSA notices are discussed more fully *infra* at 51-53.

[28] Non-manufacturer sources included NHTSA notices, Herndon & Associates Immobilizer Charts ("Herndon"), Northeastern Technical Services ("NETS"), North American Technical Forensic Services ("NATFS") (Mangine's list), and SD Lyons.  Goldstein Decl. ¶¶ 38, 40.  The November 2009 Herndon list covers 1997–2010 model years and identifies vehicles that have a SecuriLock, Sentry Key, Pass-Key I, II and III, PassLock I, II and III or Nissan immobilizer system.  Goldstein Decl., Ex. "D".  The April 20, 2010 NETS list, which the defendants produced in discovery, covers 1998–2010 model years and identifies vehicles that have a Pass-Key I, PassLock or transponder.  Pl.'s Ex. 216.  The NATFS list covers 1998–2008 model years and identifies those with a Pass-Key, PassLock or a transponder.  Pl.'s Ex. 101.  The March 2012 SD Lyons list covers 1998–2012 model years and identifies vehicles that have Pass-Key I and II, PassLock or a transponder.  Goldstein Decl., Ex. "E".  Because Herndon and NETS only covered model years through 2010, and NATFS only through 2008, the plaintiff used only two non-manufacturer sources for model years 2011 and 2012—SD Lyons and Edmonds.com.  For model years 2010 or earlier where the owner's manual states "if equipped" or no manufacturer's source is available, and no data is available from at least two of the non-manufacturer sources, the plaintiff consulted Edmonds.com and

system is optional, the plaintiff sometimes cites a non-manufacturer source to show what submodels, if any, are equipped with the antitheft device as standard equipment. When the plaintiff cannot locate an owner's manual, he relies on several non-manufacturer sources to conclude that a given antitheft device is standard equipment on that particular make and model.

Manufacturer sources are reliable to identify class members. No one knows better than the manufacturer what antitheft device is installed in its vehicle and how that device is activated. The owner's manuals, manufacturer's specifications, manufacturer-created spreadsheets, and product brochures describe the passive antitheft devices in sufficient detail for each year, make, and model vehicle to determine whether they are standard equipment. Therefore, the plaintiff may rely on the manufacturers' description of the devices and how they operate to identify what vehicles were equipped with qualifying devices.[29]

Non-manufacturer sources, other than NHTSA notices which are issued based upon the manufacturer's description of the device, are not reliable for determining whether a manufacturer's device is standard equipment in a vehicle because they are not consistent. Although we stated in our summary judgment opinion that insurers could use third-party vendor sources to determine what vehicles are entitled to the discount, we instructed that these sources were to be used *in conjunction with* information from manufacturers, the government, and the applicant made available to

---

ISO. Goldstein Decl. ¶¶ 52–53.

[29] In light of our holding, and as explained in more detail *infra*, the plaintiff shall amend his Chart of Qualifying Vehicles consistent with this Opinion.

the insurer at the time of the insurance application. *Willisch*, 852 F. Supp. 2d at 597–98. We did not say that the insurer could rely solely on non-manufacturer sources.

Here, in the context of class certification, reliance solely on non-manufacturer sources to identify class members is not acceptable. Neither Progressive nor the plaintiff has access to every non-party vendor's data from past years for all models and years. Additionally, each third-party vendor has its own methods and criteria for reaching its determinations, making review of their data unreliable. Significantly, there are conflicts among the different sources about the same vehicle line.[30] Hence, the plaintiff may not use non-manufacturer sources to identify makes and models of vehicles that are equipped with qualifying devices.

With respect to Progressive's objection to reliance on owner's manuals that contain language indicating that the antitheft device in a vehicle line is optional,[31] the

---

[30] *See, e.g.*, 2002–04 Jeep Wrangler (Edmunds - Standard in Sahara submodel, SD Lyons - Standard in Sahara submodel, Herndon - Optional, NETS - Optional, NATFS - Optional); 2002–03 Chrysler PT Cruiser (SD Lyons - Standard in Limited and Touring submodels, NETS - Optional, NATFS - Optional); 2001–04 Chrysler Concorde (SD Lyons - Standard in Limited and Lxi submodels, NETS - Optional, NATFS - Optional); 2001–03 Chrysler Sebring Convertible (SD Lyons - Standard in Limited and Lxi submodels, Herndon - Standard in Limited and Lxi submodels, NATFS - Optional, Edmunds - Optional); 1999.5 Nissan Pathfinder (NETS - Standard in all models, NATFS - Standard in all models, SD Lyons - Standard in all models, Herndon - Standard in all models, Edmunds - neither optional nor standard, Cars.com - neither optional nor standard); 2007 Chrysler Aspen (Edmunds - Standard in Limited submodel, NETS - Standard in all models, NATFS - Standard in all models, SD Lyons - Standard in all models, Herndon - Standard in all models); 2007 Jeep Patriot (Edmunds - Standard in Limited and Sport submodels, NETS - Standard in all models, SD Lyons - Standard in all models, Herndon - Standard in all models); 2004 Jeep Grand Cherokee (Edmunds - Standard in Laredo, Limited and Overland 4W D submodels, Herndon - Standard in Laredo and Limited submodels, NETS - Standard in all models, SD Lyons - Standard in all models, NATFS - Optional); 2004 Dodge Durango (Edmunds - Standard in Limited submodel, SD Lyons - Standard in Limited submodel, Herndon - Optional, NETS - Optional, NATFS - Optional); 2004 Chrysler 300M (Herndon - Standard in all models, NATFS - Standard in all models, SD Lyons - Optional, SD Lyons - Optional); 2004 Chrysler Sebring Sedan (Herndon - Standard in Limited and Touring submodels, SD Lyons - Standard in all models, NETS - Optional, NATFS - Optional).

[31] Examples of owner's manuals with this "optional" language include: "Controls and Features" "SecuriLock Passive Anti-Theft System (If Equipped)" (from 2011 Ford Transit Connect and 1999 Ford Ranger owner's manual); "Nissan Vehicle Immobilizer System (if so equipped)" (from 2010–13 Nissan Frontier and 2008 Nissan Xterra owner's manuals; "Sentry Key - If Equipped" (from 2007–08 Chrysler Pacifica owner's manuals); "Passlock (Option) - Your vehicle may be equipped with the Passlock theft-

27

vehicle can be included on the class list as long as the manufacturer's specification, spreadsheet or brochure shows that the particular trim level comes with the device as standard equipment.[32]    Conversely, where the owner's manual indicates that the antitheft device is optional and there is no other manufacturer source identifying the device as standard equipment, that vehicle may not be included on the class list.[33]

Likewise, where the owner's manual reflects that the antitheft device is optional and there is no source saying otherwise, or where the plaintiff cites only a non-manufacturer's source, the vehicle may not be included on the Chart of Qualifying Vehicles.[34]   However, where a qualifying device is optional for a given make and model

_____

deterrent system" (from 1995 Pontiac Sunfire owner's manual).

   [32] *See, e.g.*, 1999–2000 and 2006 Ford Ranger 3.0L and 4.0L submodels, 2001–02 and 2007–10 Ford Ranger 2.3L, 3.0L and 4.0L submodels, 1998–2000 Ford Contour SVT and Mercury Mystique V6 submodels, 1996–1997 Ford Taurus LX and SHO submodels and 1996–97 Mercury Sable LS submodels (citing the Ford spreadsheet, which lists these submodels as equipped with the SecuriLock antitheft system as standard equipment), and 2013 F-250XL, XLT and Lariat submodels (citing Ford specifications, which lists these submodels as equipped with the SecuriLock antitheft system as standard equipment); 2010–2013 Nissan Frontier SE, LE, SV and Pro-4x submodels and 2008 Nissan X-Terra X, S, SE and OR submodels (citing Nissan specifications, which list these submodels as equipped with the NVIS system as standard equipment); 2007–08 Chrysler Pacifica FWD and AWD submodels, 2008 and 2010 Chrysler PT Cruiser and PT Cruiser Convertible LX, Touring and Ltd. submodels, 2005–06 Chrysler Sebring Convertible and Sedan Base, Limited and Touring submodels and 2007 Chrysler Town & Country Base, Limited and Touring submodels (citing Chrysler specifications, which list these submodels as equipped with a "Sentry Key Engine Immobilizer" as standard equipment); 2007 Dodge Caliber SE, R/T and SXT submodels, 2005–07 Dodge Dakota Laramie submodels, 2008 Dodge Dakota Laramie, SLT, TRX and Sport submodels, and 2009–10 Dodge Dakota Laramie and TRX submodels (citing Dodge specifications, which list these submodels as equpped with a "Sentry Key Engine Immobilizer" as standard equipment).

   [33] *See, e.g.*, 2010–13 Ford Transit Connect XLT submodel (citing SD Lyons and Edmunds); 2011 Ford F-250 pickup (citing SD Lyons and cars.com); 2011–13 Ford F-350 and F-450 (citing cars.com); 2008–10 Ford F-250 and F-350, 2004 Chrysler Concorde and Chrysler Sebring Convertible Limited and Lxi submodels (citing SD Lyons); 2007 Chrysler Aspen Limited submodel, 2007 Jeep Patriot Limited and Sport submodels, 2004 Jeep Wrangler Sahara submodel, 2004 Jeep Grand Cherokee Laredo, Limited and Overland 4WD submodels, 2004 Dodge Durango Limited submodel and 2011 Dodge Dakota Laramie submodel (citing Edmunds).

   [34] *See, e.g.*, 2004 Chrysler 300M, 2004 Chrysler Sebring Sedan Limited and Touring submodels, and 2009 Chrysler PT Cruiser Limited and Touring submodels (citing only owners manuals); 2002–03 Jeep Wrangler Sahara submodels (citing Edmunds); 2002–03 Chrysler PT Cruiser Limited and Touring submodels and 2001–03 Chrysler Concorde Limited and Lxi submodels (citing SD Lyons); 2001–03

vehicle, an owner or lessor of a vehicle with a factory installed qualifying device may submit an affidavit or a copy of the vehicle sticker showing standard equipment and installed options.[35]

We turn now to examine in detail the manufacturer and NHTSA sources on which the plaintiff relies in compiling his Chart of Qualifying Vehicles, and will address Progressive's specific objections to the reliance on those sources.

### *Manufacturer Sources*

The manufacturers of vehicles equipped with qualifying devices are General Motors, Ford, Chrysler, Mercedes and Nissan. Devices found to be qualifying as "passive" under the statute are: VATS/Pass-Key I, Pass-Key II, Pass-Key III, Pass-Key III+, and PassLock (General Motors); SecuriLock/PATS (passive anti-theft system) (Ford); Sentry Key (Chrysler); FBS III passive immobilizer system (Mercedes); and Nissan Vehicle Immobilizer System (Nissan). *Willisch*, 852 F. Supp. 2d at 599–605.

The makes of the automobiles included on the chart are: Chevrolet, Buick, GMC, Cadillac, Hummer, Saturn, Oldsmobile, Pontiac, Isuzu Ascender and Hombre, 2007–08 Suzuki XL-7, and 2005–09 Saab 9-7X (General Motors); Ford, Lincoln, Mercury, Mazda 3, 5, 6, CX-5, CX-7, CX-9, MX-5 and Tribute, and 2000–08 Jaguar S-Type (Ford); Chrysler, Dodge, Jeep, 2009–12 Volkswagen Routan, 2000–01 Plymouth Neon LX, and 2012–13 Fiat 500 (Chrysler); all Mercedes (Mercedes); and Nissan and Infiniti

---

Chrysler Sebring Convertible Limited and Lxi submodels (citing Herndon and SD Lyons); 1999 Nissan Pathfinder (citing NETS, NATFS, SD Lyons); 2000–08 Jaguar S-Type (citing NETS, NATFS, Herndon and SD Lyons). *See also* 1999 Chrysler Sebring Convertible Jxi submodel (citing no source).

[35] *See City Select*, 867 F.3d at 441.

(Nissan).[36]   In sum, the makes and models of these vehicles were equipped with qualifying passive antitheft devices.

*FORD*

Because the SecuriLock system is a qualifying device, each insured Ford vehicle equipped with it qualifies for the discount.   Ford uses the SecuriLock system exclusively.  It operates the same way in each insured Ford vehicle equipped with it.

There are several manufacturer sources that identify Ford, Lincoln and Mercury vehicles that contain a SecuriLock antitheft system as standard equipment.  They are owner's manuals, Ford's spreadsheet, and Ford specifications.  NHTSA notices, which were prepared based on information provided by Ford, also identify vehicles equipped with SecuriLock.

Ford Owner's Manuals

Ford, Lincoln and Mercury owner's manuals identify the antitheft system in each vehicle and describe how it operates.  As described, the SecuriLock system arms the vehicle immediately after the operator switches the ignition to the OFF, LOCK or ACCESSORY position.  When the ignition is in the OFF or LOCK position, the theft indicator will flash once every two seconds "to indicate the SecuriLock system is functioning as a theft deterrent" or "protecting your vehicle."  Thus, the manuals describe both arming and verification processes.

Ford Spreadsheet

During discovery, Ford produced a spreadsheet entitled "Passive Anti-Theft System (SecuriLock™)" ("Ford Spreadsheet").  It identifies the Ford vehicles that, from the

------

[36] Goldstein Decl. ¶ 6.

time of "the inception of this technology [1996] through the 2010 model year," "contain a passive antitheft system as standard equipment."[37] The spreadsheet clearly identifies all 1996–2010 Ford, Lincoln and Mercury model vehicles that are equipped with a SecuriLock antitheft device as standard equipment.[38] Therefore, the Ford Spreadsheet may be used to identify Ford vehicles by make, model, and year that had a SecuriLock antitheft system as standard equipment.

<u>Ford Specifications</u>

Ford specifications are another manufacturer's source that clearly identify the SecuriLock system as standard equipment in certain Ford vehicles. Consequently, when an owner's manual for a vehicle line, such as the Ford 2013 F-250 pickup, reflects that the antitheft system is optional, specifications may be used to identify Ford vehicles in that trim line having the SecuriLock system as standard equipment.

<u>Ford NHTSA Notices</u>

NHTSA notices pertaining to Ford vehicles may also be used to identify Ford, Mercury, Lincoln and Mazda vehicle lines that contain a SecuriLock antitheft system as standard equipment. The plaintiff cites Ford NHTSA notices to show that the GT and Cobra submodels of the 1996 Ford Mustang line came equipped with a SecuriLock/PATS immobilizer antitheft device as standard equipment.[39] He also relies on Ford NHTSA notices to show that certain Mazda vehicle lines contain a SecuriLock

---

[37] *See* May 26, 2010 letter from Ford's counsel enclosing spreadsheet (Pl.'s Ex. 222).

[38] Progressive did not object to the Ford spreadsheet's reliability. Nor did it contend that it is not clear.

[39] The plaintiff cites this additional source because the owner's manual for the 1996 Ford Mustang indicates that the antitheft system is optional. Goldstein Decl. ¶ 58.

antitheft system as standard equipment.[40]

Contending that language in some Ford NHTSA notices conflicts with language in other Ford NHTSA notices and in some Ford owner's manuals, Progressive objects to the plaintiff's reliance on NHTSA notices to show that any Ford or Mazda models can be included.[41] The purported conflicts are either immaterial or non-existent.

First, Progressive objects to reliance on NHTSA notices to show that the 1996 GT and Cobra Mustang submodels came equipped with a SecuriLock immobilizer antitheft device. It argues that language in the notices is inconsistent with language in the 1996 and the 1997 Ford Mustang owner's manuals because NHTSA notices refer to the antitheft device as a "SecuriLock," whereas those owner's manuals refer to the device as a "Coded Key Anti-Theft System."[42]

Although Ford named its anti-theft system "SecuriLock" in 1998, it was created two years earlier under the moniker PATS. *Willisch*, 852 F. Supp. 2d at 600 n.57. Later NHTSA notices refer to the antitheft system installed in the 1996 and 1997 Mustang vehicle lines as both "SecuriLock" and "PATS" (passive anti-theft system). Since 1999, all Ford NHTSA notices state that beginning in 1996 for the Mustang GT and Cobra trim submodels, and in 1997 for the entire Mustang line, the "SecuriLock" or "SecuriLock/PATS" antitheft system was installed as standard equipment. *See* 79 Fed. Reg. 18410 (Apr. 1, 2014) ("Ford stated that the SecuriLock/PATS system was

---

[40] The plaintiff relies on this additional source because owner's manuals for these Mazda vehicles refer to the antitheft system as an "immobilizer," not a "SecuriLock." Goldstein Decl. ¶ 65.

[41] Progressive also objects to reliance on any NHTSA notice on the grounds that it constitutes inadmissible hearsay. *See* Doc. No. 104 at 30–31; Doc. No. 148 at 19. We address this general objection *infra* at 51-53.

[42] Doc. No. 148 at 19.

introduced as standard equipment on all of its MY 1996 Ford Mustang GT, Cobra and other selected models . . . . [, and] that in MY 1997, the SecuriLock/PATS system was extended to the complete Ford Mustang vehicle line as standard equipment."); 76 Fed. Reg. 2444 (Jan. 13, 2011) (same, except referring to antitheft system installed as "Ford's 'SecuriLock' device"); 71 Fed. Reg. 7824 (Feb. 14, 2006) (same); 64 Fed. Reg. 7949 (Feb. 17, 1999) (same).  Thus, because they describe the same device, the NHTSA notices and owner's manuals describing the antitheft system installed in the 1996 and 1997 Mustang lines are not substantively inconsistent.

Next, Progressive objects to the plaintiff's reliance on NHTSA notices to show that the Mazda 3, 5, 6, CX-5, CX-7, CX-9 and MX-5 model vehicles contain a SecuriLock antitheft device as standard equipment because the owner's manuals for these vehicles refer to the antitheft system as an "immobilizer," not a "SecuriLock."[43] This argument ignores the detailed descriptions showing that the devices operate in the same way.

The language in Mazda NHTSA notices describing how the immobilizer device is designed and activates is virtually identical to the language in NHTSA notices covering Ford vehicles.  For example, NHTSA notices for both the 2003 Mazda 6 and the 2000 Ford Taurus describe the antitheft device as "a transponder-based electronic immobilizer system. . . . [which] is activated when the driver/operator turns off the engine using the properly coded ignition key."[44]  Additionally, both notices state that the

_____

[43] *See* Doc. No. 148 at 21.

[44] 67 Fed. Reg. 35191 (May 17, 2002) (2003 Mazda 6); 64 Fed. Reg. 7949 (Feb. 17, 1999) (2000 Ford Taurus).

proposed device is the same antitheft system that was installed as standard equipment on the 1996 Ford Mustang GT and Cobra, the Taurus Lx and SHO and Sable LS models, and on the entire 1997 Mustang line.[45]

Notably, the language in Mazda owner's manuals describing how its immobilizer system activates is almost identical to the language in Ford owner's manuals describing how SecuriLock operates. For example, the owner's manuals for the Mazda 3, 5, 6, CX-5, CX-7, CX-9 and MX-5 state that the "immobilizer system is armed when the ignition switch is turned from the ON position to the ACC or LOCK position. The security indicator light in the instrument cluster flashes every 2 seconds until the system is disarmed." Similarly, Ford owner's manuals describe the SecuriLock system as being armed "after switching the ignition to the OFF, LOCK or ACCESSORY position." They also describe the verification process, stating that "when the ignition is in the OFF or LOCK position, the theft indicator will flash every 2 seconds to indicate the SecuriLock system is functioning as a theft deterrent" or "protecting your vehicle."

The virtually identical language in the Ford and Mazda NHTSA notices and in the Ford and Mazda owner's manuals is sufficient to show that the immobilizers installed in these Mazda vehicles are the same as the SecuriLock devices.

Progressive also argues that the plaintiff cannot rely on NHTSA notices pertaining to Ford vehicles because language in some NHTSA notices regarding how the immobilizer device activates is not consistent with language in other NHTSA notices or in some owner's manuals.

---

[45] *Id.*

Progressive points to a NHTSA notice issued in 2014[46] that does not use the exact words used in an earlier NHTSA notice cited in the summary judgment opinion. It argues that the newer NHTSA notice focuses on turning the ignition key to the "Run/Start" position, as opposed to the older notice, which states that the SecuriLock is "activated when the driver/operator turns off the engine by using the properly coded ignition key."[47]

The descriptions of the SecuriLock device in the earlier and later NHTSA notices are not inconsistent. The NHTSA notice we cited in the summary judgment opinion,[48] which pertains to the 2000 Ford Taurus vehicle line, states as follows:

> The Ford SecuriLock is a transponder-based electronic immobilizer system [that] is activated when the driver/operator turns off the engine by using the properly coded ignition key. When the ignition key is turned to the start position, the transponder (located in the head of the key) transmits a code to the powertrain's electronic control module. The vehicle's engine can only be started if the transponder code matches the code previously programmed into the powertrain's electronic control module. If the code does not match, the engine will be disabled . . . . [E]ach transponder is hard-coded with a unique code at the time of manufacture. Additionally, Ford stated that the communication between the SecuriLock control function and the powertrain's electronic control module is encrypted.[49]

The 2014 NHTSA notice, which pertains to the 2015 Fiesta vehicle line, provides as follows:

---

[46] 79 Fed. Reg. 18410 (Apr. 1, 2014).

[47] Doc. No. 148 at 20.

[48] *See Willisch*, 852 F. Supp. 2d at 601 & n.58.

[49] 64 Fed. Reg. 7949 (Feb. 17, 1999).

> [W]hen the ignition key is turned to the "Run/Start" position on the SecuriLock/PATS system . . ., the transceiver module reads the ignition key code and transmits an encrypted message from the keycode to the control module. Once the key is validated, starting of the engine is authorized by sending a separate encrypted message to the powertrain control module (PCM). Ford stated that the powertrain will function only if the keycode matches the unique identification keycode previously programmed into the cluster of the SecuriLock/PATS-equipped vehicles. . . . [If] the codes do not match, the vehicle will be inoperable.[50]

The notices do not conflict. Except for the first sentence in the earlier notice, which states that the SecuriLock device "is activated when the driver/operator turns off the engine by using the properly coded ignition key," the remaining language describing how SecuriLock operates is virtually identical to the description in the 2014 NHTSA notice. Both notices describe the transponder-based SecuriLock system as allowing the vehicle's engine to be started only when the coded ignition key is turned to "start" and the encrypted code transmitted by the transponder in the key matches the code in the powertrain control module. Both notices also state that the engine remains disabled or inoperable if the codes do not match.

Progressive points to another NHTSA notice[51] it contends is inconsistent with several Ford owner's manuals. According to the notice, which considered Ford's 2010 petition for exemption from the parts-marking requirements of the theft prevention standard for the 2012 Fusion, Ford stated that the SecuriLock device "has been installed as standard equipment on all North American Ford, Lincoln and Mercury vehicles *except* for the F-Super Duty, Econoline and Crown Victoria Police Interceptor

---

[50] 79 Fed. Reg. 18410 (Apr. 1, 2014).

[51] 76 Fed. Reg. 2444 (Jan. 13, 2011).

vehicles."[52]  Progressive contends that this is not an accurate statement because there are Ford vehicles other than F-Super Duty, Econoline and Crown Victoria Police Interceptor models manufactured after 2010 for which SecuriLock is not installed as standard equipment, rendering the NHTSA notice inconsistent with the owner's manuals.[53]  Progressive identifies only two vehicle lines since model year 2010 whose owner's manuals contain "If Equipped" language in the SecuriLock section.  They are the Ford Transit Connect, and the Ford F-150 pickup.

Progressive is correct that the SecuriLock system is optional on model years 2010–13 of the Ford Transit Connect.  Owner's manuals for those model years state "If Equipped" next to the heading of the SecuriLock section, and Ford specifications reflect that only XLT trim models come equipped with an immobilizer system.[54]  However, because the Transit Connect was first manufactured in North America in 2010, it explains why Ford did not include this model in the petition submitted to NHTSA that same year.  In a later NHTSA notice, Ford added the Transit Connect to the list of those vehicle lines that did not have SecuriLock installed as standard equipment.[55]  Therefore, there is no conflict between the NHTSA notices and the owner's manuals for the Transit

---

[52] 76 Fed. Reg. 2444 (Jan. 13, 2011) (emphasis added).

[53] Doc. No. 148 at 20.

[54] *See, e.g.,* Ford brochure for 2010 Transit Connect at 13, *available at:* http://www.ford.com/services/assets/Brochure?make=Ford&model=Transit%20Connect&year=2010 (last visited June 1, 2018).

[55] *See* 78 Fed. Reg. 4192 (Jan. 18, 2013) ("Ford also reported that beginning with MY 2010, the SecuriLock device was installed as standard equipment on all of its North American Ford, Lincoln and Mercury vehicles but was offered as optional equipment on its 2010 F-series Super Duty pickups, Econoline and Transit Connect vehicles.").  The Crown Victoria model was no longer listed as a vehicle line that did not have SecuriLock installed as standard equipment, presumably because 2011 was the last model year for that vehicle.

Connect.

With respect to the F-150 pickup, although in the owner's manuals for model years 2011–17 the wording "If Equipped" appears in the heading of the section describing the SecuriLock device, the manufacturer's brochures listing the specifications reflect that the SecuriLock passive antitheft system is a standard feature in all F-150 models for those model years.[56]  Consequently, the 2011 NHTSA notice is not inconsistent with any Ford owner's manuals.

In summary, any conflicts in language in Ford NHTSA notices or between Ford NHTSA notices and Ford owner's manuals are either immaterial or non-existent.  Since 1999, Ford NHTSA notices have uniformly stated that the 1996 GT and Cobra submodels and the entire 1997 Mustang line contain a SecuriLock or SecuriLock/PATS immobilizer device as standard equipment.  Additionally, except for occasionally using different names interchangeably to refer to the same immobilizer device installed in the vehicle line, Ford NHTSA notices and owner's manuals describe how the antitheft device is designed and activated in nearly identical language.  Therefore, the plaintiff may also use Ford NHTSA notices to identify Ford, Mercury, Lincoln and Mazda vehicle lines that contain a SecuriLock antitheft system as standard equipment.

## CHRYSLER, DODGE, JEEP

Because Chrysler's Sentry Key Engine Immobilizer System is a qualifying device, each insured Chrysler, Dodge and Jeep vehicle that has a Sentry Key device installed as standard equipment qualifies for the discount. There are several manufacturer

---

[56] *See* Standard Features section of each model year brochure.  *See, e.g.,* brochure for 2012 F-150 at 19–20, *available at*: http://www.ford.com/services/assets/Brochure?make=Ford&model=F150&year=2012 (last visited June 1, 2018).

sources that identify Chrysler, Dodge and Jeep vehicles that come with a Sentry Key antitheft system as standard equipment. They are owner's manuals, product specifications, product brochures, and a list of vehicle features prepared at the request of Allstate Insurance Company, one of the defendants in the related cases where pre-certification settlements were approved.

## Chrysler Owner's Manuals

Chrysler, Dodge and Jeep owner's manuals identify vehicles containing a Sentry Key antitheft system as standard equipment. Virtually every Chrysler, Dodge and Jeep owner's manual states that the Sentry Key Immobilizer System does not need to be armed or activated, and that "operation of the system is automatic regardless of whether or not the vehicle is locked or unlocked."

## Chrysler Specifications

Chrysler and Dodge specifications are a manufacturer's source that clearly identify whether a Sentry Key antitheft system is standard equipment in a vehicle line. Consequently, when an owner's manual for a vehicle line reflects that the antitheft system is optional, such as for the 2005 and 2006 Chrysler Sebring Convertible Limited and Touring submodels and Dodge Durango Limited submodel, specifications reliably identify which Chrysler and Dodge model year vehicles come with a Sentry Key antitheft system as standard equipment.

## Product Brochures and List of Features

Chrysler's product brochures and lists of features identify some Chrysler, Dodge and Jeep model year vehicles that come with a Sentry Key antitheft system as standard

equipment. One Chrysler product brochure[57] lists the 1999 Jeep Grand Cherokee Limited submodel, but not the Laredo submodel, as having a "Vehicle Theft Security System with security alarm and Sentry Key Engine Immobilizer" as standard equipment.[58] Because this is a manufacturer's document, it identifies the 1999 Jeep Grand Cherokee Limited submodel as containing a Sentry Key system as standard equipment.

The lists of features of Chrysler's 1999 model year vehicles show whether the particular vehicle line contains either (1) a "Standard Passive Audible Alarm w/ Immobilizer"; (2) a "Standard/Optional Passive Audible Alarm w/ Immobilizer"; or (3) an "Optional Passive Audible Alarm w/ Immobilizer."[59] The list does not differentiate among different trim levels. The first category includes entire vehicle lines that contain a Sentry Key immobilizer system as standard equipment. The second category includes vehicle lines where Sentry Key is installed as standard equipment in some submodels and not in others.

The 1999 Jeep Grand Cherokee is listed in the second category, which reflects that Sentry Key is standard *or* optional in this vehicle line. Hence, the list of features does not show whether the Sentry Key system is installed as standard equipment in the

---

[57] Pl.'s Ex. 22 at 730, 761.

[58] Boyle, the named plaintiff in this action, owned a 1999 Jeep Grand Cherokee Limited. In discovery, the insurers produced the manufacturers' documents pertaining to the named plaintiffs' vehicles. This included Chrysler product brochures and a list of features of its 1999 model year vehicles that Chrysler prepared for Allstate in 1998 at Allstate's request. Because we found on summary judgment that there was insufficient evidence to determine whether a Sentry Key antitheft system was installed in Boyle's vehicle as original standard equipment, the plaintiff cites Chrysler's product brochure and list of features for the 1999 Jeep Grand Cherokee in support of placing this submodel on the Chart of Qualifying Vehicles. There are no other Chrysler product brochures or features lists for other model year vehicles in the record.

[59] Pl.'s Ex. 22 at 730, 733.

1999 Limited submodel.[60]

GENERAL MOTORS

Because GM's Pass-Key and PassLock immobilizer systems are qualifying devices, each insured GM vehicle equipped with one qualifies for the discount. GM owner's manuals, GM's spreadsheet and GM specifications identify GM vehicles that are equipped with a Pass-Key or PassLock antitheft system as standard equipment.

<u>General Motors Owner's Manuals</u>

GM owner's manuals reliably describe whether a model year Chevrolet, Buick, GMC, Cadillac, Hummer, Saturn, Oldsmobile, Pontiac, Suzuki XL-7, Saab 9-7X, Isuzu Ascender and Isuzu Hombre vehicle contains a Pass-Key or PassLock antitheft system as standard equipment. The owner's manuals identify the antitheft device in each vehicle. They also describe how the device works.

The owner's manuals state that the Pass-Key and PassLock systems operate in one of the following ways:

- "The vehicle is automatically armed/immobilized when the key is removed from the ignition."

- "The vehicle is automatically armed/immobilized when the vehicle/ignition is turned off."

---

[60] During discovery, Chrysler produced a chart depicting the percentage of "North American SKIM [Sentry Key Immobilizer] usage" for 1998-2003 vehicles. This document notes that "all premium vehicles, Chrysler 300M, Chrysler Concorde, Chrysler LXI, Chrysler Town & Country, and Jeep Grand Cherekee [*sic*] have SKIM 100% in MY 2001 and beyond." *See* Pl.'s Ex. 219 at 4890. However, the representations on this chart are inaccurate. According to owner's manuals, the Sentry Key system is optional on some of these post-model year 2001 vehicles. *See, e.g.,* owner's manuals for the 2004 Jeep Grand Cherokee, 2004 Chrysler Concorde, 2004 Chrysler 300M, and 2007 Chrysler Town & Country, which all read: "Sentry Key Engine Immobilizer - If Equipped." Therefore, this chart cannot be used to determine whether the vehicle line contains a Sentry Key system as standard equipment.

-   "Pass-Key is a passive theft deterrent system. It works when you insert or remove the key from the ignition."

-   "This vehicle has a passive theft-deterrent system. The system does not have to be manually armed or disarmed.

-   "This is a passive theft deterrent system. This means you do not have to do anything special/different to arm or disarm the system."

General Motors Spreadsheet

In response to a subpoena, GM produced a spreadsheet that identifies all 2003–10 GM vehicles that contain a Pass-Key or PassLock device as standard equipment.[61]  It covers 2003–10 model years of Chevrolet, Buick, GMC, Cadillac, Hummer, Saturn, Oldsmobile and Pontiac vehicles.[62]

General Motors Specifications

GM specifications also clearly identify GM vehicles that contain a Pass-Key or PassLock antitheft system as standard equipment.  Consequently, for the few GM model year vehicle lines that are not on the GM Spreadsheet and for which the plaintiff lacks an owner's manual, *see, e.g.,* 1992–93 Cadillac Allante, specifications may be used to identify GM model year vehicles that come with a Pass-Key or PassLock antitheft system as standard equipment.

---

[61] Progressive did not object to its reliability.

[62] Pl.'s Ex. 223.

## *MERCEDES*

## Mercedes Owner's Manuals

Mercedes owner's manuals[63] identify the Mercedes Immobilizer System as standard equipment in each Mercedes vehicle. They describe the vehicle's immobilizer as activating in one of two ways, depending on whether the vehicle uses a key or Keyless-Go device. If using an ignition key in certain model year 2000–02 vehicles, removing it "from the steering lock or starter switch activates the start lock-out, [where] the engine cannot be started."[64] In all other model year vehicles, shutting off the engine by "turn[ing] the key in the starter switch [or ignition lock] to position 0, and remov[ing] the key from the starter switch activates the immobilizer."[65] The engine immobilizer in the Keyless-Go system is activated when the driver "turn[s] off the engine by means of the start/stop button on the gear selector lever and open[s] the driver's door." Pressing the Keyless-Go start/stop button places the starter switch in position 1, which shuts off the engine, and opening the driver's door places the starter switch in position 0, which is "the same as [the] key removed from the starter switch."[66] The Key and Keyless Go immobilizers are activated when the engine is turned off and the key is removed from the ignition. Both are qualifying devices.

---

[63] Although the plaintiff attaches owner's manuals for only two Mercedes vehicles (the 2010 G-Class and the 2012 SLS-Class, *see* Doc. Nos. 107-6 and 107-63 in Civ. A. No. 09-5276), he states that he would produce owner's manuals for other Mercedes vehicles at the court's request. *See* Doc. No. 142 at 4–5. In any event, owner's manuals for all Mercedes vehicles for years 2000–18 are available online. *See* https://www.mbusa.com/mercedes/service_and_parts/owners_manuals (last visited June 1, 2018).

[64] *See, e.g.*, owner's manuals for 2000-02 Mercedes SL, CLK and E Class models.

[65] *See, e.g.*, owner's manuals for 2003-16 Mercedes SL and E Class, and 2003-09 CLK Class models.

[66] *See, e.g.*, owner's manuals for 2003-16 Mercedes SL and E Class, and 2003-09 CLK Class models.

<u>Mercedes Internal Documents</u>

Mercedes-Benz USA produced an internal table listing seven types of Mercedes' Drive Authorization System ("DAS") engine immobilizers installed as standard equipment on various 1996–2002 Mercedes vehicles.[67]  It confirmed, in its cover letter, that the DAS system was standard equipment in all Mercedes models since model year 2003.

Progressive objects to this table and letter because both documents refer only to a DAS system, not an "FBS" system, which is what we called the Mercedes immobilizer system in our summary judgment opinion.[68]  Progressive also argues that reliance on this chart is misplaced because it does not explain how the seven immobilizer types are activated or which make and model Mercedes vehicles contain which type of DAS immobilizer.

The FBS and the DAS are the same immobilizer systems.  Mercedes does not have two antitheft systems.  It has one.

In any event, the internal table and letter are not needed to prove which Mercedes vehicles are equipped with qualifying devices.  Mercedes owner's manuals for model year vehicles 2000 through 2017, which are available online, describe every Mercedes vehicle as having an engine immobilizer installed as standard equipment.

---

[67] In the letter enclosing the table, Mercedes stated that it was "attach[ing] two (2) documents that we were able to locate internally regarding various Drive Authorization Systems (DAS), or engine immobilizers, that have been used in Mercedes-Benz vehicles since model year 1996." Doc. No. 112-5 at 3.

[68] On summary judgment, in addition to owner's manuals, we relied on two NHTSA notices to conclude that the Mercedes immobilizer system qualified for the passive antitheft device discount. The NHTSA notices referred to Mercedes' device as the "FBS III immobilizer system." *See Willisch*, 852 F. Supp. 2d at 603 & n.68.  There is no difference between the DAS and the FBS systems.

Therefore, all makes and models from 2000 and since qualify as "passive" under the statute.

## NISSAN/INFINITI

Because Nissan and Infiniti's Vehicle Immobilizer Systems are qualifying devices, each insured Nissan and Infiniti vehicle that has such a device installed as standard equipment qualifies for the discount. Nissan and Infiniti owner's manuals, Spreadsheet, and specifications, and NHTSA notices identify Nissan and Infiniti vehicles that are equipped with a Nissan or Infiniti Vehicle Immobilizer System as standard equipment.

### Nissan and Infiniti Owner's Manuals

Nissan and Infiniti owner's manuals identify the antitheft system in each vehicle and describe how the device operates. They explain that the Nissan/Infiniti Vehicle Immobilizer System activates when the registered NVIS key or Intelligent Key is removed or turned to the Lock, ACC or OFF position. At the same time, the security indicator light blinks, indicating that the security systems on the vehicle are operational.

### Nissan/Infiniti Spreadsheet

Nissan North America produced a spreadsheet that lists Nissan and Infiniti 2000–11 model year vehicles that are equipped with an engine immobilizer or vehicle security system as standard equipment ("Nissan/Infiniti Spreadsheet").[69] The spreadsheet clearly identifies all 2000–11 Nissan and Infiniti vehicle lines that are equipped with a Nissan Vehicle Immobilizer System or an Infiniti Vehicle Immobilizer

---

[69] *See* Doc. No. 112-14.

System as standard equipment.[70]

<u>Nissan/Infiniti Specifications</u>

As with all manufacturers' specifications, Nissan and Infiniti specifications reliably identify vehicles that are equipped with a Nissan or Infiniti Vehicle Immobilizer System.[71] Consequently, for vehicle lines on the Nissan/Infiniti Spreadsheet that are listed as not containing a NVIS or IVIS as standard equipment, or whose owner's manual reflects that the device is optional, specifications may be used to identify the submodels[72] that contain the antitheft system as standard equipment.

<u>Nissan/Infiniti NHTSA Notices</u>

Although the plaintiff does not rely on any Nissan or Infiniti NHTSA notices to show that certain make and model year vehicles contain an NVIS or IVIS device installed as standard equipment, Progressive argues that purported inconsistencies between the Nissan NHTSA notices and the owner's manuals raise "a factual question" about how Nissan devices activate.[73] Progressive seems to be saying that because of these "factual disputes," no vehicle containing a NVIS or IVIS device qualifies for the discount. Having argued that NHTSA notices are unreliable, Progressive now wants to use them to undermine Nissan's owner's manuals and specifications.

Nissan NHTSA notices are consistent. They confirm what vehicle lines are

---

[70] Progressive did not object to its reliability or contend that it is unclear.

[71] Nissan and Infiniti specifications can be found on Nissan's and Infiniti's websites, located at https://www.nissanhelp.com and https://www.infinitihelp.com, respectively, by selecting "models," choosing the year and model vehicle, and clicking "specs." *See* Goldstein Decl. ¶¶ 31-32.

[72] *See, e.g.*, 2011 Nissan Frontier Crew Cab.

[73] Doc. No. 148 at 32.

equipped with a Nissan or Infiniti immobilizer device as standard equipment.

Progressive points to three Nissan NHTSA notices from 2010, 2011 and 2012 that it contends describe non-qualifying NVIS devices. In these notices, Nissan describes the immobilizer system and the alarm system for the 2011 Nissan Cube, 2012 Nissan Leaf and 2013 Nissan Juke as activating "when the ignition is turned to the 'OFF' position and all the doors are closed and locked through the use of the key or the remote control mechanism." Progressive contends that the requirement to close and lock the doors to activate the device disqualifies the device for the discount. Additionally, it argues that this language conflicts with that in the 2007 Nissan Murano owner's manual and NHTSA notices from 2001 and 2009, which we cited in the summary judgment opinion and which Progressive concedes, "describe a device that activates consistently with the statute."[74] Those earlier sources state that the Nissan immobilizer device is automatically activated by turning the ignition switch to the "OFF" position using the proper ignition key, at which point a security indicator light flashes, indicating that the immobilizer device is activated. *Willisch*, 852 F. Supp. 2d at 603–04 & nn.69–70 (citing 2007 Nissan Murano owner's manual; 74 Fed. Reg. 28768-02 (June 17, 2009); 66 Fed. Reg. 53830-01 (Oct. 24, 2001)).

Contrary to Progressive's argument, the Nissan NHTSA notices are consistent. The language in the NHTSA notices that Progressive contends conflicts with the owner's manuals describes an alarm system. The 2010, 2011 and 2012 notices, which contain language requiring the doors to be closed and locked to activate the antitheft

---

[74] *See* Doc. No. 148 at 31.

device, describe activation of the *alarm system*, not the engine immobilizer.  In contrast, the NHTSA notices from 2001 and 2009, which we cited in the summary judgment opinion, do not contain that additional requirement because there is no alarm system installed as standard equipment on the model year vehicles to which those notices refer.

Specifically, the 2009 NHTSA notice, which grants Nissan's petition for exemption of the Nissan Murano vehicle line beginning with model year 2010, provides as follows:

> Nissan will install a passive, transponder-based, electronic engine immobilizer device as standard equipment on its Murano line beginning with MY 2010. Nissan stated that the immobilizer system prevents normal operation of the vehicle without the use of a special key. Turning off the ignition key automatically activates the immobilizer device. Features of the antitheft device will include an engine electronic control module (ECM), immobilizer control (BCM), antenna and transponder key. Nissan also stated that its device will *not incorporate an audible and visual alarm feature as standard equipment*, but the alarms will be incorporated on some of its models.
>
> *          *          *          *
>
> Nissan has incorporated a "Security" indicator light in the vehicle which will provide a signal to inform the vehicle owner as to the status of the immobilizer device. When the ignition key is turned to the "OFF" position, the indicator light begins flashing to reliably notify the operator that the immobilizer device is activated.[75]

The owner's manual for the 2010 Nissan Murano mirrors the language in the 2009 NHTSA notice.  It indicates that the alarm system is optional, and that the immobilizer device is activated when the ignition key is turned to the "OFF" position.

---

[75] *See* 74 Fed. Reg. 28768-02, at *28769 (emphasis added).

The security indicator light then blinks to show that the immobilizer device has been activated.[76]

The later 2011 NHTSA notice, which grants Nissan's petition for exemption of the Nissan Leaf vehicle line beginning with model year 2012, provides as follows:

> Nissan will install its passive transponder-based, electronic immobilizer antitheft device as standard equipment on its Leaf vehicle line beginning with MY 2012. Major components of the antitheft device will include an immobilizer control module (BCM), immobilizer antenna, security indicator light, electronic immobilizer and vehicle control module. *Nissan will also install an audible and visible alarm system on the Leaf as standard equipment.* Nissan stated that activation of the immobilization device occurs when the ignition is turned to the "OFF" position and all the doors are closed and locked through the use of the key or the remote control mechanism.
>
> *          *          *          *
>
> Nissan stated that the immobilizer device prevents normal operation of the vehicle without the use of a special key. Nissan further stated that incorporation of the theft warning alarm system in the device has been designed to protect the belongings within the vehicle and the vehicle itself from being stolen when the back door and all of the side doors are closed and locked. The alarm system is activated when any attempt is made to open any of the vehicle doors without the use of the key or remote control mechanism. Nissan stated that upon alarm activation, the head lamps will flash and the horn will sound. . . . Additionally, Nissan has incorporated a "Security" indicator light in the vehicle which it states will provide a signal to inform the vehicle owner as to the status of the immobilizer device. When the ignition key is turned to the "OFF" position, the indicator light begins flashing to notify the operator that the immobilizer device is activated.[77]

This NHTSA notice pertaining to the 2012 Nissan Leaf describes two separate

---

[76] *See* Doc. No. 139-92 at 16–17.

[77] *See* 76 Fed. Reg. 36615-01, at *36615-16 (emphasis added). The two other NHTSA notices Progressive cites contain virtually identical language. *See* 75 Fed. Reg. 19458-01; 77 Fed. Reg. 15843-01.

components of the antitheft system, the immobilizer and the alarm, installed as standard equipment in that vehicle line. In describing the immobilizer, it contains the same language as the 2009 notice: "Nissan has incorporated a 'Security' indicator light in the vehicle which it states will provide a signal to inform the vehicle owner as to the status of the immobilizer device. When the ignition key is turned to the 'OFF' position, the indicator light begins flashing to notify the operator that the immobilizer device is activated." In describing the "audible and visible alarm system," it explains that it is "designed to protect the belongings within the vehicle . . . from being stolen when the back door and all of the side doors are closed and locked," and states that if an attempt is made to open any door without using the key or remote, the head lamps will flash and the horn will sound.

The owner's manual for the 2012 Nissan Leaf similarly describes the immobilizer and the alarm as two separate components of the vehicle's antitheft system. It states that the Nissan Vehicle Immobilizer System is activated when the ignition switch is turned to the "OFF" position, after which the security indicator light blinks to indicate that the immobilizer has been activated. In describing the alarm system, the owner's manual indicates that it is armed by closing and locking the doors, and "provides visual and audio alarm signals" if the doors are opened without use of the key or remote.[78]

Progressive focuses on a single sentence in the NHTSA notices to question its reliability. Based on a reading of the notices in their entirety and considering the

_____

[78] *See* Doc. No. 139-90 at 17–18. The owner's manuals that correspond to the vehicle lines addressed in the two other NHTSA notices contain identical language. *See id.* at 7–9.

owner's manuals that correspond to the same vehicle lines to which the notices refer, it is clear that the language requiring the doors to be closed and locked in order to activate the antitheft device describes activation of the *alarm system*, not the immobilizer.  An alarm system is not an engine immobilizer device.  The former sounds an audible alarm.  The latter disables the vehicle.  The doors must be closed and locked to arm the alarm system because its audio and visual signals can only be triggered by an unauthorized attempt to open the vehicle's door.  The NHTSA notices from 2001 and 2009 do not contain the additional door closing and locking requirement because an alarm system is not standard equipment on the model year vehicles to which those notices refer.

In summary, the NHTSA notices are not inconsistent.  There is no "factual question" about how NVIS devices activate.  The Nissan NHTSA notices reliably identify model year vehicles that contain a Nissan or Infiniti immobilizer system as standard equipment.

### *NHTSA Notices are Admissible and Reliable*

Progressive also argues that NHTSA notices are inadmissible hearsay.  On the contrary, they are admissible under the "public records exception" of Federal Rule of Evidence 803(8).  This rule provides that a public record, even if hearsay, is admissible if it sets forth factual findings from a legally authorized investigation and is trustworthy. Fed. R. Evid. 803(8)(A)(iii), (B).

Investigative reports are not excluded from evidence merely because they state a conclusion or opinion.  Rather, conclusions that meet the trustworthiness standard and are based on factual investigations are admissible.  *See Trull v. Volkswagen of Am.,*

*Inc.*, 187 F.3d 88, 97 (1st Cir. 1999).

Under a federal regulatory scheme aimed at preventing auto theft, auto manufacturers are subject to the parts-marking requirement of the Federal Motor Vehicle Theft Prevention Standard, requiring them to mark various parts of certain vehicles "to reduce the incidence of motor vehicle thefts by facilitating the tracing and recovery of parts from stolen vehicles." 49 C.F.R. §§ 541.1–.5. Each year, some manufacturers petition the NHTSA for an exemption from the parts-marking requirement because the vehicle line has an antitheft device as standard equipment that is "likely to be as effective in reducing and deterring motor vehicle theft as compliance with the parts-marking requirements." 49 C.F.R. § 543.2.

Under 49 C.F.R. §§ 543.5 and 543.6, each petition for an exemption must set forth "the data, views, and arguments" of the manufacturer supporting the exemption. The specific information includes:

> (1) A statement that an antitheft device will be installed as standard equipment on all vehicles in the line for which an exemption is sought; (2) a list naming each component in the antitheft system, and a diagram showing the location of each of those components within the vehicle; (3) a discussion that explains the means and process by which the device is activated and functions, including any aspect of the device designed to – (i) facilitate or encourage its activation by motorists, . . . [and] (iv) prevent the operation of a vehicle which an unauthorized person has entered using means other than a key.

49 C.F. R. §§ 543.5, 543.6.

NHTSA, after review and analysis of the manufacturer's detailed submissions, issues a notice containing factual findings about how the antitheft device installed as standard equipment in the vehicle line at issue operates and activates. It then

concludes that the device is or is not "likely to be as effective in reducing and deterring motor vehicle theft as compliance with the parts-marking requirements." Because the NHTSA notices are based on analysis of data provided by manufacturers, they are admissible. In essence, the notices can be considered manufacturer sources.

The NHTSA notices are not being relied upon to determine whether a given antitheft device qualifies under the Pennsylvania passive antitheft device provision. Instead, they are used to show what type of device is standard equipment in a manufacturer's vehicle and how it works.

### Progressive's Other Objections

Progressive contends that there is no evidence that the antitheft devices examined in the summary judgment opinion "activate the same way in every car model in every model year." In support, Progressive points to a small number of Ford and GM owner's manuals that purportedly describe the antitheft system as activating when the ignition is turned "on," which appears to conflict with the statutory requirement that the device must activate when the ignition is turned "off" to qualify. It also points to some Ford, GM and Chrysler owner's manuals that contain insufficient information to ascertain how the device is activated.[79]

With respect to Ford vehicles, although the vast majority of Ford owner's manuals contain language stating that the "vehicle is armed [with SecuriLock] immediately after switching the ignition to the 1 (LOCK) position" and "[w]hen the ignition is in the OFF position, the [theft] indicator will flash once every 2 seconds to indicate the SecuriLock system is functioning as a theft deterrent," a few Ford owner's

_____

[79] *See* Doc. No. 148 at 1, 3, 8, 9 and n.5, 11, 22–23 and n.18.

manuals describe a process that occurs when the ignition key is turned to the "on" position."[80]  That process is not how the immobilizer system is activated, but how it alerts the operator that the system is working.

Each of these owner's manuals describes a system prove-out process, not the activation of the immobilizer.  Progressive conflates the two.  The language stating that turning the valid key to "on" "activates" the theft indicator light to blink refers to a process that verifies the immobilizer system is working properly.  It does not mean the system is "armed" when turning the key to "on."  The description of how the operator is alerted that the immobilizer system works does not describe how the SecuriLock system antitheft device works.

Regarding General Motors vehicles, most GM owner's manuals describe the Pass-Key or PassLock device installed in the vehicle as activated when the ignition is switched off or the key is removed.  For example, owner's manuals for the 2009–13 Chevy Impala state that the Pass-Key III+ system is "automatically armed when the key is removed from the ignition." The key cannot be removed unless the key is in the "off" position.  Other owner's manuals do not contain identical language, but they reflect that the vehicle's antitheft device qualifies for the discount.  For example, the owner's manual for the 2007 Cadillac SRX states "Your vehicle has Pass-Key III+ . . . a passive theft deterrent system. This means you do not have to do anything special to arm or

---

[80] *See, e.g.*, owner's manuals for the 1996–97 Ford Mustang (stating that the "theft indicator provides system *proveout* and operating status [and] the system *activates the indicator* when the ignition switch is placed in the ON or START position.") (emphases added); the 2000–02 Ford Focus (stating that "[w]hen the ignition is turned to ON, the theft indicator will light for three seconds and then go out (indicates proper SecuriLock system operation)"); and the 1997–98 Ford Expedition (stating that the "anti-theft system briefly illuminates when the ignition is turned to the ON position to verify that the passive anti-theft system is operating properly.").

disarm the system. It works when you transition the key to ON, ACCESSORY or START from the OFF position. When the Pass-Key III+ system senses that someone is using the wrong key, it prevents the vehicle from starting."

As do the Ford owner's manuals, the GM manuals describing the antitheft device as "working" when the key is turned to the "on" position are describing a system prove-out process. Inserting the valid key in the ignition and turning it to "on" verifies that the antitheft system is working properly. Like Ford, GM describes a process verifying that the immobilizer system works. The description does not mean, as Progressive suggests, that the system is "armed" when turning the key to "on."

Progressive also contends that some Ford, General Motors and Chrysler owner's manuals contain insufficient information to determine how the antitheft device is activated, which it says shows that antitheft devices in different make and model year vehicles do not activate in the same way.[81] It points to owner's manuals that state that if an invalid key is used to turn the ignition switch to "on," the engine's fuel system will be disabled and the security light will blink.[82] Progressive contends that "there is no

_____

[81] Doc. No. 148 at 9.

[82] *See, e.g.*, owner's manuals for: the 1996–97 Ford Mustang, Ford Taurus and Mercury Sable, and the 1997–98 Ford Expedition and Lincoln Mark VII (stating that the "vehicle is equipped with a coded key anti-theft system," and "can only be started with an electronically coded key," and the "theft illuminator light briefly illuminates when the ignition is turned to ON to verify that the passive anti-theft system is operating properly"); the 1999–2005 Chevrolet Astro and the 2000–05 Chevrolet Impala (stating that "PassLock enables fuel if the ignition lock cylinder is turned with a valid key. If a correct key is not used, fuel is disabled," and that "during normal operation, the SECURITY light will go off approximately five seconds after the key is turned to the RUN ignition position"); and the 2000 Chrysler 300M and Chrysler LHS, the 2004–06 Chrysler Sebring Convertible and Sedan, the 2005–06 Dodge Dakota and Ram 1500, the 2004–06 Dodge Durango and Stratus Sedan, and the 1999 Jeep Grand Cherokee (stating that "an electronically coded ignition key sends a signal to the vehicle electronics. If the system does not recognize the signal the vehicle will not start," and that the "Sentry Key light will illuminate for about 2 seconds when the ignition switch is first turned to the On position. If the vehicle electronics do not recognize the signal from the ignition key, the light will flash continuously to signal that the vehicle has been immobilized.").

discernible difference between the descriptions in those" owner's manuals and the owner's manuals for the Honda Accord,[83] which we held in our summary judgment opinion contained insufficient language to explain when the immobilizer is armed or activated.[84] It asserts that all of these owner's manuals "describe turning the key to the 'on' position" and "fail to indicate the device is 'activated automatically when the operator turns the ignition key to the off position'—the statutory standard."[85]

Progressive seems to be arguing that the absence of "magic language" in the owner's manual and a reference to turning the ignition to "on" either disqualifies the device or, at least, renders the owner's manual insufficient to determine when or how the device on that particular make and model year vehicle is activated.

The language in the owner's manuals for these particular Ford, GM and Chrysler vehicles is indeed similar to that in the Honda Accord manuals. Even if this language, alone, might be insufficient to determine whether a device qualifies, an additional reliable source, such as a NHTSA notice or an owner's manual for another vehicle containing the same antitheft device, can show that the device in that model year vehicle qualifies. Indeed, in our summary judgment opinion, to determine that PassLock is a qualifying device, we considered the language in the 2000 Chevrolet Blazer owner's manual, which uses similar language as the Honda manuals to describe how its

---

[83] Progressive contends that the Chart of Qualifying Vehicles "contains many entries where the owner's manual tracks the language in the Honda Accord manual." Doc. No. 148 at 23 n.18.

[84] *See* Doc. No. 148 at 8–9 (citing *Willisch*, 852 F. Supp. 2d at 607). The 2007 and 2008 Honda Accord owner's manuals describe the Honda immobilizer device as follows: "The immobilizer system protects your vehicle from theft. If an improperly-coded key (or other device) is used, the engine's fuel system is disabled. . . . When you turn the ignition switch to the ON (II) position, the immobilizer system indicator should come on briefly, then go off. If the indicator starts to blink, it means the system does not recognize the coding of the key." *Willisch*, 852 F. Supp. 2d at 607.

[85] *See* Doc. No. 148 at 8–9.

PassLock device operates, *along with* a 1996 NHTSA notice describing GM's PassLock antitheft device in the 2000 Chevrolet Impala/Monte Carlo.

When we considered whether the Honda immobilizer device qualified for the discount, we examined only the 2007 and 2008 Honda Accord owner's manuals because no NHTSA notice describing the Honda device had been issued. In considering the PassLock device, we not only had an owner's manual, but also several NHTSA notices to aid us in making our determination.

Progressive misunderstands or mischaracterizes what the manufacturers describe. The language in owner's manuals for different model vehicles of the same manufacturer describing the device and how it works is not always identical. However, the linguistic variances do not mean the devices do not activate the same way. They all describe a device that immobilizes the vehicle when the ignition is turned to the "off" position.

Finally, Progressive argues that there are two additional flaws with the plaintiff's proposed class definition. First, it argues that including vehicles that Polk[86] and HLDI[87] code as having a passive device in the class definition is inappropriate because Polk and HLDI's definitions of "passive" do not match the statute's or Progressive's rate

---

[86] For model years 2006 and newer, Polk identifies vehicles with a "passive engine immobilizer," which means that there is an engine immobilizer system built into the vehicle's steering column and the car will not start without recognition of the key by the lock's tumbler, and those with a "passive Sentry Key," which is defined as a laser cut key or key containing a micro chip that works in conjunction with an engine immobilizer. A "passive" system is defined as being "activated automatically when the ignition key is turned on or off." For model years before 2006, it lists vehicles with an "Immobilizer" or "Passkey." Pl.'s Ex. 169 at 3813.

[87] HLDI defines a device as "passive" if it is automatically armed when the vehicle's doors are locked normally. If in addition to locking the doors another step is required to arm the device, it is considered an "active" device. Pl.'s Ex. 119 at 2120, 2429.

filing.[88]  Second, it argues that requiring Progressive to have given an antitheft device discount to an insured of the class member's make, model and year vehicle as a condition of class membership does not establish that the device qualifies under the statute.[89]

As we have concluded, the plaintiff cannot rely on non-manufacturer sources to identify vehicles having qualifying antitheft devices.  They are not reliable.  Thus, we agree with Progressive that the Polk and HLDI reports may not be used.

Progressive only gives the antitheft device discount to insureds who answer "yes" when a Progressive agent asks them whether their car contains a passive antitheft device.  Consequently, the fact that Progressive has given a discount to an insured of a certain make and model year does not mean that the device in that make and model year vehicle qualifies.  By the same token, just because Progressive did not give a discount to an insured who did not answer affirmatively that his vehicle contains a passive antitheft device does not mean that the device in that insured's vehicle does *not* qualify.  Requiring Progressive to have previously given a discount to an insured of a certain make and model year vehicle to entitle others insuring that same make and model vehicle excludes members of the class who are entitled to the discount.

Summarizing, in identifying whether an engine immobilizer system is installed as standard equipment on a vehicle line, the plaintiff may rely on the following manufacturers' sources:  owner's manuals; manufacturers' specifications; Ford, GM and Nissan spreadsheets; and NHTSA notices pertaining to Ford and Nissan vehicles.  He

[88] Doc. No. 114 at 5–6.

[89] Doc. No. 114 at 10–11.

may not rely on the HLDI and Polk's classification of vehicles' antitheft devices. Therefore, the plaintiff shall amend the Chart of Qualifying Vehicles consistent with this opinion.

In light of the amendments to be made to the Chart of Qualifying Vehicles, we shall slightly modify the plaintiff's proposed class definition.[90] The class will consist of Progressive policyholders who, during November 2005 to 2018, had comprehensive insurance coverage on a make, model and year vehicle registered in Pennsylvania and identified on the amended Chart of Qualifying Vehicles as having a Pass-Key or PassLock system, SecuriLock/PATS system, Sentry Key Immobilizer System, Nissan/Infiniti Vehicle Immobilizer System, or Mercedes Immobilizer system as standard equipment and did not receive at least a ten percent antitheft device discount on the comprehensive insurance premiums.

## Conclusion

The plaintiff has satisfied the requirements of Rule 23(a), and has met the requirements of Rule 23(b)(3) by showing that common questions of law and fact predominate over individual questions, and a class action is superior to other methods for fairly and efficiently adjudicating the issues. The plaintiff's proposed class definition also satisfies the ascertainability standard because class members can be reliably and

---

[90] It is within our discretion to alter or limit the class definition to remedy a defect in it. *Finberg v. Sullivan*, 634 F.2d 50, 64 (3d Cir. 1980) (where a problem meeting certification requirements "might well be remedied by requiring a more specific or a narrower definition of classes[,] the district court should not deny certification . . . without considering the possibility of redefining the classes."); *Sheller v. City of Philadelphia*, 288 F.R.D. 377, 383 (E.D. Pa. 2013) ("A problematic class definition does not automatically require the district court to deny class certification; rather, the court may limit or alter the definition to remedy the problem.'") (citations omitted); *Jackson v. Se. Pennsylvania Transp. Auth.*, 260 F.R.D. 168, 182–83 (E.D. Pa. 2009) (same); *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 497 (E.D. Pa. 2009) (holding that proposed class as redefined by court's addition of fourteen words to class definition ameliorated defendant's objection that class definition was vague and satisfied class certification requirements).

readily identified based on an administratively feasible method using objective criteria.

Therefore, we shall grant the motion for class certification.